## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | | |
|---|---|---|
| **ROBERT BENNETT** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **CIVIL ACTION FILE NO.** |
| **v.** | ) | |
| | ) | |
| **GENENTECH, INC. and** | ) | **JURY TRIAL DEMANDED** |
| **F. HOFFMANN-LA ROCHE AG,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## COMPLAINT

COMES NOW, by and through his undersigned counsel, Robert Bennett ("Mr. Bennett" or "Plaintiff") who sets forth his Complaint for damages against Defendants Genentech, Inc., ("Genentech") and F. Hoffman-La Roche AG ("Roche") and respectfully shows this Court as follows:

## PARTIES, JURISDICTION, AND VENUE

1.

Plaintiff's claims arising under the Americans with Disabilities Act, 42 U.S.C. § 12101, et. seq., present questions arising under federal law, thus jurisdiction is appropriate before this Court pursuant to 28 U.S.C. § 1331.

2.

Plaintiff's claims arising under laws of the State of Georgia are so related to his claims arising under federal law as to form part of the same case or controversy,

thus supplemental jurisdiction is appropriate before this Court pursuant to 28 U.S.C.
§ 1367(a).

3.

Plaintiff is a resident of the State of Georgia.  As discussed below, Defendants
are non-Georgia corporations who do business in Georgia.  Plaintiff's Complaint
involves a controversy that exceeds the sum of $75,000.00.  Thus, jurisdiction is also
appropriate before this Court pursuant to 28 U.S.C. § 1332.

4.

Service of Process on Defendant Genentech may be made via its registered
agent on record with the Corporations Division of the Georgia Secretary of State.
Said agent is Corporation Service Company at 40 Technology Parkway South, Suite
300, Norcross, Georgia 30092.

5.

Service of Process on Defendant Roche may be made at its corporate
headquarters located at 340 Kingsland Street, Nutley, New Jersey 07110.

## STATEMENT OF FACTS

6.

Defendant Roche is a global health-care company.  It operates under two
divisions, pharmaceuticals and diagnostics.

7.

Defendant Genentech is a biotechnology corporation and is a wholly owned subsidiary of Defendant Roche.

8.

Plaintiff was hired by Defendants in August of 2010.

9.

Plaintiff was employed by Defendants as a Field Reimbursement Manager.

10.

At all times relevant, Dan McCurren was Plaintiff's immediate manager.

11.

At all times relevant, Russell Marino, Jr., was Dan McCurren's immediate manager.

12.

Beginning in 2011, Plaintiff began to experience stiffness in his right hip. Shortly thereafter, Plaintiff suffered a cartilage tear that resulted in permanent damage to his hip.  An MRI was conducted by Dr. Marek Majoch which showed significant damage to Plaintiff's right hip.  Dr. Majoch referred Plaintiff to Dr. John Hyman.  Dr. Hyman evaluated Plaintiff and recommended immediate surgery in order to prevent the necessity of Plaintiff undergoing a full hip replacement.

3

13.

Plaintiff informed Dan McCurren of his medical situation.  In response, Mr. McCurren told Plaintiff to "not lose focus on" Plaintiff's work position.

14.

Dr. Hyman scheduled Plaintiff for a major corrective hip arthroscopy surgery.

15.

 The recovery time following major corrective hip arthroscopy surgery involves a minimum of twelve weeks of immobility with no return to work during that time.

16.

Plaintiff informed Mr. McCurren of the anticipated recovery time, and Mr. McCurren pressured Plaintiff to shorten the recovery time or to take no time at all even though such an alteration to the recovery time would represent a violation of Plaintiff's doctors' instructions.

17.

Plaintiff underwent major corrective hip arthroscopy surgery on October 7, 2011.

18.

Despite Plaintiff's serious medical condition, Dan McCurren required Plaintiff to return to work on October 10, 2011.  This was a period of time only three

days after Plaintiff's surgery.

19.

In response to Plaintiff's expression that he was not medically able to work during his recovery period, Mr. McCurren told Plaintiff to "suck it up" and continue to work.

20.

In mid-October, 2011, Plaintiff learned that he would be required to fly to San Francisco, California in order to attend a work meeting.  Plaintiff reported that he could not sit in a normal airplane seat for such a long time due to his medical condition.  Accordingly, Plaintiff requested that he be allowed to fly first class. Defendants required documentation for this request.

21.

On October 19, 2011, Dr. Hyman provided Plaintiff with medical documentation supporting his request to fly first class.  This request was initially granted.

22.

Plaintiff expressed that flying to and attending the San Francisco meeting would be contrary to his doctor's instructions.  In response, Plaintiff was told that his career would be "damaged" if he did not attend the San Francisco meeting.

23.

On or about October 21, 2011, Plaintiff flew to San Francisco, California, in order to attend a work meeting.

24.

In November of 2011, Plaintiff scheduled a vacation period.  After doing so, Plaintiff learned of a meeting that was to be held in Miami, Florida, during his scheduled vacation ("the Miami meeting").

25.

On November 16, 2011, Plaintiff asked Mr. McCurren if Plaintiff should cancel his vacation in order to attend the meeting.  Mr. McCurren told Plaintiff to "just go" and "not to worry about his job."

26.

Also on November 16, 2011, Plaintiff attended a work dinner with Mr. McCurren and other employees of Defendants ("the November 16 dinner").

27.

During the November 16 dinner, Plaintiff developed a severe fever associated with his hip injuries.

28.

During the November 16 dinner, Russell Marino repeatedly insulted Plaintiff by, among other things, mocking Plaintiff's frail condition, repeatedly asking other

employees how many meetings Plaintiff would miss due to his ailment, and mocking Plaintiff for not consuming alcohol.  Plaintiff did not consume alcohol due to his on-going recovery from hip surgery.

29.

Ultimately, Mr. Marino's harassment of Plaintiff grew so severe that Plaintiff had to step away from the business dinner in order to moderate the impact said harassment was having on his already severe fever and frail condition.

30.

Due to the harassment concerning his medical condition, Plaintiff opted to modify his vacation in order to attend the Miami meeting.

31.

As a result of being required to work during the recovery period, Plaintiff's hip healed improperly and caused him to pain, suffering, and substantially reduced mobility in his right hip.  Due to the increase in mobility required by his left hip, he has also suffered damage to the left hip as well.  This condition has caused Plaintiff to suffer from severe depression and anxiety, both made worse by the conduct described below.

32.

Plaintiff's damaged hip (in both its pre-surgery and post-surgery condition) represents a physical impairment that substantially limits multiple life functions of

Plaintiff. For example, Plaintiff's hip-related medical conditions impaired and continue to impair Plaintiff's ability walk, stand, sit, reach, lift, bend, and work. Plaintiff's medical conditions further impaired and continue to impair Plaintiff's ability to sleep, concentrate, and think.

33.

During the Miami meeting, which occurred in the beginning of January, 2012, Plaintiff was repeatedly harassed due to his medical condition.

34.

By way of example, Mr. Marino made comments such as "glad you could make it to the meeting." Russell Marino, Dan McCurren, and others also repeatedly mocked Plaintiff during a team function on a local beach. Plaintiff as harassed and mocked because he would not run or jump on the beach during the team activity.

35.

During a meeting on March 20, 2012, Russell Marino confronted Plaintiff over his medical condition. Mr. Marino repeatedly came very close to Plaintiff and taunted Plaintiff over his appearance and medical condition.

36.

On April 5, 2012, Mr. McCurren revoked the accommodation that allowed Plaintiff to fly first class.

37.

In September of 2012, at a meeting in Los Angeles, California, Plaintiff was again harassed in regard to his medical condition.  Specifically, his need for flying in first class was mocked as was his refusal to consume alcohol.

38.

On January 9, 2013, at a dinner in Texas, Dan McCurren again mocked Plaintiff's medical condition.  Particularly troubling was Mr. McCurren's mimicking of Plaintiff's limp.  Mr. McCurren mimicked Plaintiff's limp in front of the attendees of the business dinner.

39.

During a January meeting in Las Vegas, Nevada, Mr. Marino repeatedly berated Plaintiff due to his medical condition by saying things such as "You always have something wrong with you."  He and Mr. McCurren also repeatedly made comments that there was "nothing wrong" with Plaintiff, and that Plaintiff should not be allowed to fly in first class.

40.

Plaintiff was subsequently referred to as "Mr. First Class" by Mr. McCurren and Mr. Marino.

41.

During a subsequent event, Plaintiff lay down on a couch due to pain in his hip.  Mr. Marino and Mr. McCurren mocked him and said that Plaintiff should "get a better doctor."

42.

Even though Plaintiff suffered and suffers from the above-described disabilities, Plaintiff was qualified to carry out the duties required of him as a Field Reimbursement Manager.

43.

Defendant Genentech markets a drug named Xolair.  Xolair was marketed as a drug indicated for the treatment of asthma.

44.

In 2012, Defendants made the decision to market Xolair for chronic idiopathic urticarial (CIU).  CIU is a skin ailment commonly referred to as hives.  Pursuant to that decision, Defendant Roche established a CUI Planning Committee ("the CIU Committee")

45.

Beginning in April of 2012, Plaintiff was prepared for an appointment to the CIU Committee.

46.

Appointment to the CIU Committee would represent a promotion. Membership as the sole Field Reimbursement Manager would, for example, result in vastly increased visibility in the Defendants' organizations and offer the opportunity for further promotion once the work associated with the new indication was complete.

47.

In April of 2012, Mr. McCurren arranged for Plaintiff to work with Michael Crum, National Sales Director for Xolair.  The purpose of this assignment was to demonstrate Plaintiff's knowledge of dermatology to Mr. Crum.

48.

In April of 2013, Marketing Director Brian O'Shea participated in a field visit with Plaintiff, during which Mr. O'Shea discussed Plaintiff's qualifications for appointment to the CIU Committee. Mr. O'Shea telephoned Vassant Narayanan, Marketing Manager for Xolair and chair of the CIU Committee.  Mr. O'Shea asked Mr. Narayanan if he would like Plaintiff to be appointed to the CIU Committee.

49.

Mr. Narayanan approved Plaintiff's appointment to the CIU Committee.

50.

Mr. Narayanan telephoned Asthma Field Reimbursement Manager Russell Marino, Jr., in order to gain approval for Plaintiff's appointment to the CIU Committee.

51.

Mr. Marino approved Plaintiff's appointment to the CIU Committee.

52.

Plaintiff was officially appointed to the CIU Committee on April 15, 2013.

53.

After his appointment to the CIU, Plaintiff received multiple communications directly related to the business of that committee.  Plaintiff also received committee-related work assignments.

54.

On May 1, 2013, Plaintiff attended an after-hours team function at a "Go-Kart" track in South San Francisco Bay, California ("the May 1 event").

55.

Also present at the May 1 event were Russell Marino and Dan McCurren.

56.

Apart from Plaintiff and those mentioned above, at least one other manager as well as various co-workers and colleagues of Plaintiff were present at the May 1

event.

57.

Plaintiff was required to attend the May 1 event.

58.

During the event, Mr. Marino required Plaintiff to ride in a "Go-Kart" type vehicle, even though he protested that his physical impairment made it impossible for him to do so safely.

59.

Plaintiff complied with his superiors' instructions to ride in the "Go Kart" type vehicle, and incurred injuries as a result.   Specifically, the hip injury afflicting Plaintiff was greatly exacerbated.

60.

During the May 1 event, Mr. Marino and Mr. McCurren subjected Plaintiff to multiple insults and derogatory statements concerning his disability.  Many of these insults and statements were made in conjunction with the denial of Plaintiff's request that he not be made to ride in a "Go Kart" type vehicle.

61.

On May 9, 2013, Plaintiff received an unsolicited email from Tammy James-Ishibashi, of Defendant Genentech's Corporate Employee Relations Group.

62.

In the email, Ms. James-Ishibashi asked Plaintiff to make contact with her in order to discuss what she described as "concerns regarding your managers[.]"

63.

Also on May 9, 2013, and immediately after receiving the TJI email, Plaintiff made contact with Ms. James-Ishibashi.  Plaintiff did this via email and via a telephone call.  During the telephone call, Ms. James-Ishibashi related that she had received reports from several sources that Plaintiff was being mistreated by his managers.  Ms. James-Ishibashi specifically referenced the events that occurred at the May 1 event.  Ms. James-Ishibashi further stated that two sources had reported this to her.  Plaintiff confirmed that the events had indeed occurred.

64.

 Subsequently, Plaintiff met with members of the CIU Committee.  After that meeting, Plaintiff learned that Mr. Marino had told the CIU Committee that Plaintiff would not be allowed to have any formal relationship with the CIU Committee.  Mr. Marino made this communication, upon information and belief, after Mr. Bennett's conversation with Ms. James-Ishibashi.

65.

Upon Information and belief, Mr. Marino specifically instructed Mr. Narayanan to withhold the fact that Plaintiff was being taken off of the CIU

Committee from Plaintiff's immediate supervisor.   Also upon information and belief, Mr. Narayanan reported the matter to Monica Flannigan, Mr. Narayanan's manager.

66.

On June 25, 2013, Plaintiff learned that Sandy Desalvo was formally appointed to the CIU Committee.  Ms. Desalvo has less experience in dermatology than Plaintiff.

67.

Prior to going out on disability leave, Plaintiff was subjected to continued harassment and criticism that appeared inconsistent with the behavior of Defendants' employees prior to Plaintiff's conversation with Ms. James-Ishibashi.

68.

On July 16, 2013, Plaintiff was put on short-term disability leave to his deteriorating health.

69.

On July 17, 2013, Plaintiff's leave was approved.

70.

On October 24, 2013, Plaintiff filed a Charge of Discrimination with the United States Equal Opportunity Commission ("EEOC").

71.

On April 22, 2014, Plaintiff attended confidential EEOC mediation with representatives of Defendants.

72.

The EEOC mediation represented the first time that Defendants' employees became aware that Plaintiff was a patient of Dr. June Cooley, a psychologist.

73.

On the evening of April 25, 2014, only hours after the conclusion of the EEOC mediation, Dr. Cooley received an email from a person using the pseudonym "reality czech." ("the Cooley email"). The individual used an email address which was presented as "lowmntnc@gmail.com"

74.

The subject of the Cooley email read "your pt Robert Bennett[.]"

75.

The body of the Cooley email contained a line of text that read "Poor man. So depressed."  The body of the email further contained a list of eight hyperlinks that pointed to web pages containing information about Mr. Bennett.

76.

Dr. Cooley was severely disturbed and upset by the fact that she received an email casting her patient in a negative light only hours after the Defendants learned

that Plaintiff was her patient.

77.

Plaintiff was also severely disturbed and upset by the fact that one of his health care providers received an email casting him in a negative light only hours after the Defendants learned that Plaintiff was that provider's patient.

Plaintiff was particularly disturbed because, as a person familiar with the Health Insurance Portability and Accountability Act ("HIPAA"), Plaintiff was shocked that a person attending the mediation or otherwise associated with Defendants had revealed his private health care information.

78.

During February or March of 2015, Defendants published via Equifax information stating that Plaintiff had been terminated by Defendants on February 2, 2015. This information was available, by permission, to financial institutions and prospective employers.

79.

Defendants have never communicated to Plaintiff that he has been terminated, nor have they provided Plaintiff with a separation notice.

80.

Plaintiff only learned that he was evidently terminated when he applied for a home refinance loan.

81.

Upon information and belief, Plaintiff's evident termination resulted in Plaintiff being unable to obtain employment with two companies: Medtronic and Jazz Pharmaceuticals.

82.

In specific regard to Jazz Pharmaceuticals, Plaintiff was informally offered a position with that company only to have the offer retracted after completing an employment verification form that allowed Jazz Pharmaceuticals to review Plaintiff's employment history on Equifax.

83.

Defendant Genentech is an employer within the meaning of the Americans with Disabilities Act, as Amended. Defendant Genentech is a private employer with more than fifteen employees.

84.

Defendant Roche is an employer within the meaning of the Americans with Disabilities Act, as Amended. Defendant Genentech is a private employer with more than fifteen employees.

85.

Plaintiff filed an amended EEOC Charge of Discrimination on May 12, 2014.

86.

On January 26, 2016, the EEOC issued a Notice of Right to Sue to Plaintiff.

87.

Plaintiff received his Notice of Right to Sue on January 29, 2016.

**FIRST CAUSE OF ACTION:**
**DISABILITY DISCRIMINATION IN VIOLATION**
**OF THE AMERICANS WITH DISABILITIES ACT, AS AMENDED**

88.

Plaintiff incorporates by reference paragraphs 1 through 87 of this Complaint as if fully set forth verbatim herein.

89.

Plaintiff's damaged hip (in both its pre-surgery and post-surgery condition) represents a physical impairment that substantially limits multiple life functions of Plaintiff. For example, Plaintiff's hip-related medical conditions impaired and continue to impair Plaintiff's ability walk, stand, sit, reach, lift, bend, and work. Plaintiff's other medical conditions, including severe depression and anxiety, further impaired and continue to impair Plaintiff's ability to sleep, concentrate, and think.

90.

Plaintiff was at all times relevant able to perform his job-essential functions with reasonable accommodations.

91.

Plaintiff made several requests for reasonable accommodation in regard to his disability.

92.

By way of example, Plaintiff asked that he be allowed to remain off work during his recovery period immediately following his October, 2011, surgery. Plaintiff was denied this request and told to shorten the recovery time or to take no time at all.  Further, Dan McCurren required Plaintiff to return only three days after the surgery.  Mr. McCurren responded to Plaintiff's expression that he was not able to work with the phrase, "Suck it up."

93.

By way of example, Plaintiff requested that he be allowed to fly in a first class seat due to his need, which was documented by a doctor's letter, to have increased leg room when he was in a sedentary state for a prolonged amount of time.

While this request was initially granted, it was effectively denied beginning on April 5, 2012.

94.

By way of example, Plaintiff asked that he be allowed not to ride in a "Go Kart" type vehicle during an employee function.  In response, Plaintiff was berated, harassed, and ultimately forced to do so.  As a result, his already serious injury was made worse.

95.

By way of example, Plaintiff asked that he be allowed to not attend an out-of-town meeting immediately after his surgery.  In response, Plaintiff was informed that his career would be "damaged" if he did not attend and made the subject to harassment concerning his inability to travel out of town due to his disability.

96.

Additionally, Plaintiff was made to suffer a campaign of insults, mockery, and bullying on the part of Dan McCurren and Russell Marino.  This campaign was caused by Plaintiff's disability and by his attempt to obtain reasonable accommodation for the same.  This campaign also represents a refusal on the part of Defendants to engage in an interactive process aimed at arriving at such an accommodation.

97.

Defendants repeated denials of reasonable accommodation, a refusal to engage in a good-faith interactive process, and a pattern of harassment represent

violations of the Americans with Disabilities Act, as Amended.  42 U.S.C. §§ 12101, et. seq.

## SECOND CAUSE OF ACTION:
## DISABILITY RETALIATION IN VIOLATION OF
## THE AMERICANS WITH DISABILITIES ACT, AS AMENDED

### 98.

Plaintiff incorporates by reference paragraphs 1 through 97 of this Complaint as if fully set forth verbatim herein.

### 99.

Plaintiff participated in an investigation into alleged disability harassment by virtue of his communications with Ms. Tammy James-Ishibashi.

### 100.

Plaintiff frequently opposed the denial of a reasonable accommodation by verbally bringing such activity to the attention of his superiors.

### 101.

Plaintiff filed an EEOC Charge of Discrimination on October 24, 2013, and he amended the same charge on May 12, 2014, and participate in the EEOC's handling of the same.

### 102.

The conduct above is protected from retaliation by the ADA.

103.

Within one month of his conversation with Ms. James-Ishibashi, Plaintiff was removed from the prestigious CIU Committee.  Plaintiff contends that this demotion was caused by his engaging in legally protected conduct.

104.

On the very day that Plaintiff engaged in EEOC mediation concerning his charge, an individual associated with Defendants went so far as to violate HIPAA in order to harass Plaintiff's health care provider and to make it more difficult for Plaintiff to receive the medical care he needed in order to recover and, he hoped, return to his full-time employment with Defendants.

105.

Plaintiff contends that this conduct, which impaired his ability to return to work, was carried out because he participated in the EEOC's handling of his charge against Defendants and because he engaged in other protected activity.

106.

Plaintiff asserts that his evident termination and the concealment thereof was caused by his opposing illegal conduct and because he participated in the EEOC's handling of his charge against Defendants.

107.

Defendants' retaliatory conduct is in violation of the provisions of the ADA. 42 U.S.C. § 12101, et. seq., 42 U.S.C. § 12203.

### THIRD CAUSE OF ACTION:
### TORTIOUS INTERFERENCE WITH
### CONTRACTUAL OR BUSINESS RELATIONS

108.

Plaintiff incorporates by reference paragraphs 1 through 107 of this Complaint as if fully set forth verbatim herein.

109.

Defendants intentionally published information to the effect that Plaintiff had been terminated.  Defendants did this via the Equifax service.  Defendants did not inform Plaintiff of any such termination.

110.

Because they have not communicated the same to Plaintiff, Plaintiff cannot be certain as to whether he is terminated or not.  While it is evident, the lack of a separation notice and the continuation of certain benefits allow Plaintiff to argue that he may not be terminated.

111.

Plaintiff contends that, regardless of whether he was terminated in secret or whether the news of his termination was false, when Defendants published said

information without informing Plaintiff, they acted purposefully and maliciously with an intent to injure.

112.

By engaging in these actions, Defendants induced third parties (Medtronic and Jazz Pharmaceuticals) not to enter into a business relationship with Plaintiff.

113.

By so interfering in Plaintiff's business relationships, Defendants caused Plaintiff financial injury in an amount to be determined at trial.

**FOURTH CAUSE OF ACTION:**
**INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**

Plaintiff incorporates by reference paragraphs 1 through 113 of this Complaint as if fully set forth verbatim herein.

114.

On April 25, 2014, Defendants learned of Plaintiff's medical relationship with Dr. June Cooley.

115.

After mediation but on the same evening, Dr. Cooley received an email that mocked Plaintiff and his medical condition.

116.

Plaintiff contends that an employee or legal representative of Defendants, in conduct that clearly violates HIPAA, either sent the Cooley email or divulged

Plaintiff's personal health care information to the sender of the Cooley email.

117.

Conduct such as that described above is of the sort so outrageous and extreme as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.

118.

The breach of his personal information and the attempt to turn his psychologist against him has caused Plaintiff severe emotional distress.

119.

Accordingly, Defendants are liable to Plaintiff for the tort of intentional infliction of emotional distress.

## PRAYER FOR RELIEF

**Wherefore**, Plaintiff prays for a judgment as follows:

a) That the Court order Defendant to reinstate Plaintiff's employment if he is in fact terminated;

b) That the Court grant full front pay to the Plaintiff;

c) That the Court grant Plaintiff compensatory damages for the humiliation, emotional distress, and other damages caused by Defendant's conduct;

d) That the Court grant Plaintiff punitive damages for Defendant's malicious and recklessly indifferent conduct;

Case 1:16-cv-01330-WSD-JSA   Document 1   Filed 04/24/16   Page 27 of 27

e) That the Court grant Plaintiff all employment benefits he would have enjoyed had he not been discriminated and retaliated against;

f) That the Court grant Plaintiff expenses of litigation, including reasonable attorneys' fees;

g) That the Court grant Plaintiff a jury trial;

h) That the Court grant Plaintiff all other relief the Court deems just and proper; and,

i) That the Court grant temporary, preliminary, and permanent injunctive relief prohibiting Defendant from engaging in further discriminatory conduct.

Respectfully submitted this 24th day of April, 2016.


*s/ Aubrey T. Villines, Jr.*
Aubrey T. Villines, Jr.
Georgia Bar No.
2900 Chamblee-Tucker Road
Building 1
Atlanta, GA 30341
T: 770.455.1350
E: atvill7@msn.com
**Counsel for Plaintiff**

*s/ Jason L. Mitchell*
Jason L. Mitchell, Esq.
Georgia Bar No. 502711
Jason L. Mitchell & Associates, LLC
P.O. Box 2683
Alpharetta, GA 30023
T: 321.331.0229
E: jmitchell@jlmlawyer.com
**Counsel for Plaintiff**